*147 DISSENTING OPINION BY
President Judge PELLEGRINI.
The central issue in this case is whether Provident Charter School for Children With Dyslexia’s (Provident) revised application to establish a charter school satisfied the Charter School Law (CSL).[1] While I agree with 'the majority that Provident established demonstrated, sustainable support under the loose standard that we have. established,[2] expanded choices in education opportunities, and its capability to provide comprehensive learning experiences to students, at least under the lenient standards we have enunciated in the past, I disagree with the majority’s decision to allow Provident to “slide” on other mandatory provisions set forth in the CSL. Requiring strict compliance after all will insure that Charter School Boards and private management companies hired to • operate their schools have properly met the standard set forth in the CSL for the protection of students entrusted to those entities.
Specifically, for the reasons that follow, I would . find that: (1) Provident offered insufficient evidence of the manner in which community groups will be involved in its planning process; and (2) Provident’s admission policy violates applicable law¡ Because an application to establish a charter school must satisfy all the criteria mandated by Section 1719-A of the CSL, 24 P.S. § 17-1719-A, I would reverse the Charter Appeal Board’s (CAB) order granting a charter to Provident.
I.
With respect to the requirement in Section 1719-A(8) of the CSL that applicants provide “[i]nformation on the manner in which community groups will be involved in the charter school planning process,” 24 P.S. § 17-1719-A(8), I find Provident’s application deficient.
Provident specified that its coalition and board of directors consists of representatives associated with the following organizations: the International Dyslexia Association, the Pittsburgh Branch of the International Dyslexia Association, the Masonic Temple’s Total Learning Center, The Watson Institute and The Laughliri Center. While pérsonal associations with these groups may be some indicia that they will have involvement in Provident’s planning, there is nothing of record to *148 indicate that the coalition or board members participate in these organizations in any type of representative capacity. Therefore, without more, their associations are largely irrelevant to determining if Provident has submitted evidence regarding its proposed partnerships.
Further, I agree with the School District of Pittsburgh that Provident’s statements of generalized intent are too vague to provide guidance regarding how it will integrate community partnerships into the school to enhance and support the learning environment. For example, Provident’s assertion that it “will work to engage and involve parents, families and community members to promote collaboration, communication and conflict resolution,” does little aside from restating the general requirement that community groups must be involved in Provident’s planning. (Reproduced Record at 970a.) Although Provident does detail some steps it will take to initiate these partnerships — i.e., notifying local schools of its programs through letters, following up with personal phone calls, inviting representatives to visit and tour, and identifying opportunities for partnerships — it provides only speculation regarding what these partnerships will actually consist of and with whom they will exist.
Section 1719-A(8) of the CSL, although flexible, requires more. It does not request information regarding the steps charter schools plan to take to identify opportunities for partnerships, but rather, seeks information regarding the partnerships with community groups themselves. In other words, to satisfy this provision, I would And it unnecessary for Provident to negotiate the terms of its agreements with community partners, but it must take some identifiable action that could lead to arrangements with community partners. The majority’s holding provides no standards in this regard. Because the record is devoid of any information regarding specific entities with which Provident seeks to partner and any concrete methods for integrating community involvement above aspirational goals, I find the CAB’s conclusion that Provident satisfied Section 1719-A(8) of the CSL unsupported by substantial evidence.
II.
Regardless, Provident’s proposed admission policy and criteria for evaluating the admission of students did not satisfy Section 1723-A(b)(l) of the CSL[3] because it expressly violated the Pennsylvania Fair Educational Opportunities Act[4] insofar as Provident’s pre-enrollment form inquired “whether special programs are required” because the requested information “serves *149 no legitimate purpose at the pre-enrollment phase.” (R.R. at 1764a.)
While Provident’s intentions with regard to its admissions policy may be laudable in that it claims it seeks this information to better prepare for and serve its student population, its pre-enrollment form does not comply with the express language of Section 4(a)(2) of the Pennsylvania Fair Educational Opportunities Act, which imposes a blanket prohibition on seeking such information pre-admission and renders an institution’s reason for seeking such information irrelevant. 24 P.S. § 5004(a)(2). In interpreting Section 4(a)(2) to prohibit such inquiries only if used for the purposes of discriminating, the majority conflates the requirements of Sections 4(a)(1) and (2), each of which set forth separate prohibitions, and suggests that the express language of Section 4(a)(2) be ignored to further the purpose of the Pennsylvania Fair Educational Opportunities Act.
For good reason, Section 4(a) does not make the intent of a charter school applicant relevant. Rather than directing the courts to discern the subjective intent behind such inquiries, the General Assembly has outright banned them, a prohibition that the majority excuses by saying that, while illegal, the Charter School Board found that Provident really did not mean it. Moreover, regardless of Provident’s intent, this inquiry does not serve student needs at the pre-enrollment stage because applicants submitting the pre-enrollment form have not yet been accepted for enrollment and, in fact, are not enrolling.
In this case, the pre-enrollment form specifically requests whether special-needs programs are required. The information requested on the pre-enrollment form is collected before a student’s admission and, therefore, Section 4(a)(2) of the Pennsylvania Fair Educational Opportunities Act applies, barring such inquiries. 24 P.S. § 5004(a)(2).
Accordingly, I would reverse the CAB’s findings that Provident offered sufficient evidence of the manner in which community groups will be involved in its planning process and that its admission policy complies with applicable law.

. Act of March 10, 1949, P.L. 30, added by Section 1 of the Act of June 19, 1997, P.L. 225, as amended, 24 P.S. §§ 17-1701-Ato 17-1751-a.

. A charter school applicant, among other things, is required to prove "demonstrated, sustainable support” for the charter school plan by teachers, parents, community members and students as required by Section 1717-A(e)(2)(i) of the CSL, 24 P.S. § 17-17Í7-A(e)(2)(i). In determining whether an application has established ' demonstrated, sustainable support, we have given great leeway to the Board by saying that, notwithstanding that support has to be in all areas, support- "is to be measured in the aggregate and not by individual categories” and concluded that "-[fjailure to demonstrate strong support in any one category is not necessarily fatal to charter school application.” Brackbill v. Ron Brown Charter School, 777 A.2d 131, 138 (Pa.Cmwlth.2001) (quoting and approving the CAB’s interpretation proffered in that case).
In this case, the evidence of support is, for the most part, from letters or names on a petition that support the generalized notion that a charter school for dyslexic children is a good idea-. In Carbondale Area School Dist. v. Fell Charter School, 829 A.2d 400 (Pa.Cmwlth.2003), a decision that I would reverse, we seemed to indicate that generalized petitions of support was sufficient to meet this standard. However, by allowing generalized letters of support that can be obtained outside a supermarket on a Saturday morning to meet this provision, we are reading out the requirement that the support has to be "sustainable” that the General Assembly required before an applicant could receive a charter.

. Pursuant to Section 1723-A(b)(l) of the CSL:
(b)(1) A charter school shall not discriminate in its admission policies or practices on the basis of intellectual ability, except as provided in paragraph (2), or athletic ability, measures of achievement or aptitude, status as a person with a disability, proficiency in the English language or any other basis that would be illegal if used by a school district.
24 P.S. § 17-1723-A(b)(l).

. Act of July 17, 1961, P.L. 776, as amended, 24 P.S. §§ 5001-5010. Specifically, Section 4(a)(2) of the Pennsylvania Fair Educational ■Opportunities Act states:
(a) Except as provided in section 9, it shall be an unfair educational practice for an educational institution—
[[Image here]]
(2) To make any written or oral inquiry prior to admission concerning or designed to elicit information as to the race, religion, color, ancestry, national origin, sex, handicap or disability of a student seeking admission to such institution.
24 P.S. § 5004(a)(2).